IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

DON J. BEADS,

      Plaintiff,

         v.

MARYLAND STATE POLICE, *et al.*,

      Defendants.

CIVIL NO.: WDQ-12-3219

\* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OPINION

Don J. Beads sued the Maryland State Police ("MSP"), Marcus L. Brown, and Terrence B. Sheridan (collectively, the "Defendants") for violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and related race discrimination claims.[1]  Pending are the Defendants' motions for summary judgment and to strike the Plaintiff's opposition and cross-motion for summary judgment. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2014).  For the following reasons, the motion to strike will be granted in part, and the motion for summary judgment be will granted.

---

[1] 42 U.S.C. §§ 2000e, *et seq.*

I.    Background[2]

A.    Maryland State Police Discipline Procedure

MSP's Internal Affairs Division ("IAD") oversees the
investigation of any alleged misconduct by an MSP Trooper.   ECF
No. 70-16 (Decl. of Michael J. Brady) at ¶ 2.  When the
investigator completes an investigation, he mails a
recommendation to the trooper's commanding officer about whether
the allegations should be sustained, which would result in a
formal administrative charge.  *Id.* at ¶ 3.  The commanding
officer has the discretion to resolve the complaints without
formal disciplinary action or to prepare administrative charges
to be filed and served on the trooper.[3]  *Id.* at ¶ 14.

---

[2] The facts are taken from the amended complaint, ECF No. 33; the
Defendants' motion, ECF No. 70; the Plaintiff's opposition, ECF
No. 82; the Defendants' reply, ECF No. 84; and their supporting
exhibits.

In reviewing a motion for summary judgment, the nonmovant's
evidence "is to be believed, and all justifiable inferences are
to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 255 (1986).  The parties largely agree on the facts in
this matter, but dispute the inferences to be drawn from those
facts.  A few places in the Plaintiff's opposition, however,
contain factual assertions unsupported by the document the
Plaintiff cites.  Because the Court must only credit
"justifiable inferences," it will not take these conclusionary
factual assertions into consideration in ruling on the motion
for summary judgment.

[3] Although commanding officers largely resolve minor complaints
and errors in judgment, ECF No. 70-16 at ¶ 3-4, commanders may
also resolve serious infractions, *see* ECF No. 84-25 (Robert
Smolek Dep.) at 71-73.

2

If a trooper is administratively charged, he has two options: he can admit the charge or proceed to a hearing before a three-member administrative board.  ECF No. 70-16 at ¶ 5. "The accused employee can negotiate with the departmental prosecutor to try to resolve the case without a hearing at any time."  ECF No. 70-2 at 3; ECF No. 70-16 at ¶ 8.  If a trooper chooses to admit the charges, he may mitigate his punishment. *See* ECF No. 70-17 (MSP Personnel Manual) at 19.09(D)(6); ECF No. 84-25 (Robert Smolek Dep.) at 169-70.

Troopers who choose to proceed to an administrative hearing will only be disciplined if the charges are proved by a preponderance of the evidence.  ECF No. 70-16 at ¶ 5.  If the hearing board finds a trooper guilty, it will make a punishment recommendation to the MSP Superintendent.  *Id.* at ¶ 17. Penalties are largely based on the seriousness of the violations, which are categorized on a scale of "A" (least serious) to "E" (most serious).  *See id.* at ¶ 9; ECF No. 70-17 at PER 19.09-19:10.  Termination of a trooper is only permitted for Category E infractions.  ECF No. 70-16 at para 10.  These offenses may also be punished by "more than 15 days loss of leave and suspension; transfer or reassignment; demotion; ineligib[ility] for promotion for 24 months; and a fine of $500."  ECF No. 70-2 at 5; ECF No. 70-16 at ¶ 7.

To determine the appropriate discipline in each case, commanding officers or the Superintendent "consider all relevant factors that may raise or lower the original violation category including: the type of incident; injury severity; amount of damage; intent; and, the employee's record and performance level." ECF No. 70-2 at 4; ECF No. 70-16 at ¶ 6. "Recommendations for disciplinary action may be based on: mitigating and/or aggravating factors; employee motive; degree of culpability; truthfulness; disciplinary record; admission of error/mistake by employee; and, other factors arising from the case." *Id.* However, MSP has "a zero tolerance policy" for integrity violations. ECF No. 70-21 at 35-36.

B.   Disciplining the Plaintiff

The Plaintiff, an African-American, graduated from the Maryland State Police ("MSP") academy in 2002 and was assigned to the Glen Burnie Barrack. ECF No. 33, Ex. 3 ¶¶ 6, 18 (hereinafter "Am. Compl."). In January 2005, Beads was promoted to Trooper First Class ("TFC"). *Id.* ¶ 20. In Spring 2007, Beads successfully completed the written exam and oral board for the rank of Corporal, and was promoted to Corporal a few months later. *Id.* ¶ 22.

In May 2009, TFC Tamika Simmons was preparing to take the Corporal examination. ECF No. 70-4 (IAD investigation record). TFC Simmons was one of the Plaintiff's best friends; she was a

4

"sister to him and he always went the extra mile for her." ECF
No. 70-9 (Don Beads Dep.) at 14, 33. The Plaintiff was helping
TFC Simmons and two other troopers--Jerome Anthony and Otis
Ashton--"prepare for the Corporal promotional process by giving
them potential scenarios for the oral board examination." ECF
No. 82 at 4. The Plaintiff "'threw [] scenarios back and forth
with' the troopers he was helping study, had a lot of scenarios
in his own study materials, and received a lot of scenarios from
the troopers he was helping and other troopers who had helped
him in the past." *Id*. (quoting ECF No. 70-9 at 17-21).

The oral interviews for the 125 Corporal candidates were
scheduled to occur between May 4 and May 8, 2009. ECF No. 70-6.
TFC Simmons's interview was scheduled for May 6, 2009 at 4:00
pm. *Id*. On May 5, 2009, the Plaintiff called TFC Simmons
twice--once at 4:35 pm and once at 6:03 pm. ECF No. 70-10 at
13. During one of the calls, the Plaintiff gave TFC Simmons the
following hypothetical scenario to prepare for the oral
interview:

> You are the duty officer and you witness a
> trooper sexually harass a civilian employee. The
> civilian employee then slaps the trooper. What
> steps would you take?

ECF No. 70-7 at 22-24. After receiving the scenario, TFC
Simmons called Corporal Sonya Clark of MSP's Fair Practices

Office to ask Corporal Clark what actions should be taken in such a case. *Id.*

On May 9, 2009, Corporal Clark was talking with another trooper who had participated in the oral interviews. ECF No. 70-7 at 24-26. The trooper remarked generally that there was a sexual harassment scenario during the interview. *Id.* Remembering her conversation with TFC Simmons, Corporal Clark asked what the scenario had been. *Id.* The trooper informed her that the first scenario of the oral interview was:

> You are the night shift supervisor and witness one of your troopers grab and kiss the Police Communications Operator (PCO) on the lips. You hear her say, "Don't do that," and see her slap his face. What actions do you take?

*See id.*; ECF No. 70-5.

On May 11, 2009, Corporal Clark reported her interaction with TFC Simmons to her commanding officer. *Id.* She also contacted the MSP Promotional Testing Division to confirm the content of the tested sexual harassment scenario. *Id.* at 28-30. The Commander of the Promotional Testing Division determined that it was unlikely that TFC Simmons developed the sexual harassment scenario on her own because of its extreme similarity to the tested hypothetical, which had never been used on a past Corporal examination. ECF No. 70-7 at 30, 45-47, 90-91. Thus, the incident was referred to IAD for investigation. ECF No. 70-12 at ¶ 2. In an IAD interview, TFC Simmons confirmed that she

had received the hypothetical from the Plaintiff right before her oral interview.  ECF No. 70-7 at 98-99.

During his IAD interview, the Plaintiff admitted to calling TFC Simmons with the sexual harassment hypothetical, telling her that she should study the scenario because it was a "good one." ECF No. 70-9 at 29; ECF No. 70-7 at 112.  The Plaintiff even told TFC Simmons that the hypothetical "might definitely be on the test."  *See* ECF No. 70-9 at 9; ECF No. 70-22 at 69.  The Plaintiff also admitted that he did not provide the scenario to any other trooper he was helping study for the test.  ECF No. 70-7 at 113-14; ECF No. 70-9 at 32-33.  The Plaintiff, however "told investigators that he couldn't remember where, or from whom, he received the scenario."[4]  ECF No. 70-2 at 10; *see also* ECF No. 70-7 at 106-07.  "When specifically asked if he had gotten the scenario on May 4th or 5th, after the oral interview process had begun, Plaintiff replied, 'it's possible, it makes sense, I don't recall but it's possible.'"  ECF No. 70-2 at 10; *see also* ECF No. 70-9 at 9; ECF No. 70-7 at 106-107; ECF No. 70-12 at ¶ 7.  The Plaintiff denied knowing that the hypothetical he provided was a test scenario.  ECF No. 70-4 at 7-8.

---

[4] The Plaintiff asserted that he must have heard someone mention the scenario in passing and thought it would be a good hypothetical for TFC Simmons.  ECF No. 82-1 at 28, 33-34.

IAD investigators were able to establish that two other troopers in the Plaintiff's barrack participated in the 2009 oral interviews--TFC Jason Bigham and TFC Frank Logsdon. ECF No. 70-9 at 16-17. "[The] Plaintiff told investigators that he had spoken to both of them after their oral interview boards, but could not recall the substance of those conversations." ECF No. 70-2 at 11; ECF No. 70-9 at 16-17. TFC Bigham's oral interview occurred on May 5, 2009 at 11:00 am. The Plaintiff's cell phone records established that between his two calls to TFC Simmons on that day, the Plaintiff called TFC Bigham. ECF No. 70-10 at 13.

Subsequently, IAD interviewed TFC Bigham on two occasions.[5] ECF No. 70-4 at 16. TFC Bigham admitted talking to the Plaintiff on the phone, but denied providing any of the oral interview scenarios. *Id*. However, TFC Bigham did admit having a conversation with a corporal in which he asked "how to handle the situation if someone asked him to disclose oral board scenarios." ECF No. 82-3 at 4-6. The Plaintiff corroborated TFC Bigham's version of events, stating, "I'm certain that he didn't give me any scenario that was on that test." ECF No. 70-

---

[5] In addition to TFC Bigham, IAD interviewed 28 other people; "however, none indicated that they had any conversation with Plaintiff concerning scenarios used in the oral interview board." ECF No. 70-2 at 11.

19 at 5-8.  After the interview, the lead IAD investigator

cancelled TFC Bigham's scheduled polygraph[6] because

> In this instance we had a phone record.  And we
> have   Mr.   Bigham-or   Trooper   Bigham,   denying
> involvement   and   we   have   your   Plaintiff,   Corporal
> Beads, saying that he didn't get it from him.  So we
> had really nothing to go in and counter him on on a
> polygraph.  We had no other information to go on for
> a polygraph exam.

ECF No. 70-21 at 51-52.[7]  IAD did not pursue a formal

investigation against TFC Bigham or administratively charge him

with any violation.  *See* ECF No. 70-12 at ¶ 12.  The lead

investigator believed that TFC Bigham had provided the test

question, but felt that his hands were tied because all IAD had

was one phone call to the Plaintiff and the Plaintiff refused

"to throw Bigham under the bus."  ECF No. 70-21 at 90-91, 102.

On May 5, 2010, the Plaintiff's administrative hearing was

held, as the Plaintiff chose not to admit the charges.  The

Plaintiff did not testify, but transcripts of his IAD interviews

were admitted.  ECF No. 70-10 at 2-3.  The board found the

Plaintiff guilty of all charges and recommended his termination.

*Id.* at 27.  On August 16, 2010, Superintendent Sheridan

---

[6] TFC Simmons and the Plaintiff underwent polygraph examinations
on August 11, 2009.  *See* ECF No. 70-4 at 16.

[7] Polygraphs are not admissible in administrative hearings, so
the lead investigator concluded that they "could not use the
polygraph alone to go forward with an investigation.  I could
have polygraphed him, he could have come back deceptive, and
that's all I have."  ECF No. 82-2 at 51-55.

concurred with the Board's punishment recommendation, and the Plaintiff was terminated. *Id.* at 30.[8]

On September 14, 2010, the Plaintiff filed an appeal in the Circuit Court for Baltimore County, Maryland. Am. Compl. ¶ 27. The Circuit Court overturned Beads's termination because the MSP had failed to disclose the transcript of Bigham's investigatory interview, which the court determined was potentially exculpatory evidence. *Id.* The Plantiff argued to the Circuit Court that "[t]here was just no, no evidence presented whatsoever about what happened during that [phone] conversation [between the Plaintiff and TFC Bigham]." ECF No. 70-23 at 10-11.

On August 20, 2011, another MSP Hearing Board found the Plaintiff not guilty of all charges. ECF No. 13 at ¶¶ 4, 8. During this hearing, the Plaintiff chose to testify and presented witnesses. *Id.* at ¶¶ 5-7. The Plaintiff was reinstated with backpay. *Id.* ¶¶ 10-11.

---

[8] From June 13, 2007 to August 1, 2011, Sheridan was the Secretary of the Department of State Police and the Superintendent of the MSP. Am. Compl. ¶ 16. Brown is Sheridan's successor to this position. Id. ¶ 17.

C.    Alleged Comparators

In the amended complaint, the Plaintiff alleges that "MSP has a clear pattern of subjecting its black and white officers to disparate disciplinary measures[, and] MSP routinely pursues more serious charges and takes more severe disciplinary action against black officers than it does white officers who engage in similar misconduct." Am. Compl. at ¶ 30.  In support of his claim, the Plaintiff provided alleged comparators in addition to TFC Bigham. *See* Am. Compl. at ¶ 30.

Comparator A is a white TFC who was charged in April 2009 with falsifying records.  ECF No. 70-16 at 5.  Comparator A's only prior disciplinary incidents were two "departmental accidents." *Id*.  Comparator A admitted to a lesser Category A offense rather than pursuing an administrative hearing.  ECF No. 82-9 at 8; ECF No. 70-16 at 5.  However, during the same investigation, IAD also investigated an African-American trooper for falsifying records.[9] *See* ECF No. 84-3 at 72-79.  As was the case with Comparator A, the departmental prosecutor permitted the African-American trooper to plead guilty to a lesser charge. *Id*.

---

[9] The Plaintiff did not include this individual as a comparator.

Comparator B, a Detective Sergeant, was charged in 2010 with unbecoming conduct, a Category B violation. ECF No. 82-9 at 7. Comparator B pled guilty and received a 10-day suspension.[10]  *Id.*

Comparator C, a white TFC, was charged on October 11, 2007 with filing a false report because he was falsifying the number of tickets he issued, a Category E offense. ECF No. 82-9 at 8. The IAD investigation sustained the charges, but MSP was forced to dismiss them in April 2008 because the charges were not properly filed within the one-year statute of limitations. *Id.*

Comparator D, a white corporal, was charged with a Category E offense in 2010 for sexual conduct while on duty. ECF No. 82-9 at 8. Comparator D pled guilty to the offense and was demoted to the rank of trooper. *Id.*

Comparator E, a white sergeant, was charged "with use of insulting language concerning race, a Category D offense . . . ." ECF No. 70-16 at 6. Comparator E pled guilty. *Id.*

The Plaintiff also provided the disciplinary history of another African-American TFC, hereinafter "Comparator F," who was charged with two counts of failure to obey a lawful order and one count of neglect of duty, all Category C offenses. ECF

---

[10] Comparator B was originally charged with a Category E offense for submitting a false timesheet. *See* ECF No. 82 at 30-31. The charges were sustained by the IAD investigation; however, the charges were withdrawn by the prosecutor and were pled down to the Category B violation. *Id.*; ECF No. 82-9, Appendix B.

No. 70-16 at 5.  Comparator F had four prior disciplinary infractions and pled guilty to the charges.  *Id*.  Comparator F was suspended with pay.  Am. Compl. at ¶ 30.

In his opposition, the Plaintiff also submits statistics supporting his assertion.  First, the Plaintiff offers the retention percentage of the African-American troopers in his graduating class compared to the retention percentage for the white troopers.  ECF No. 82 at 36-38.  Second, the Plaintiff cites a discipline chart submitted by the Defendants.  ECF No. 82 at 27-29.  The Plaintiff asserts, according to the chart, that all but one of the 16 African-American troopers charged with Category E violation in the past two years were terminated, while nine of the 36 white troopers accused of Category E violations were not terminated.  *Id*.

D.   Procedural History

On November 2, 2012, the Plaintiff sued the Defendants. ECF No. 1.[11]  On April 12, 2013, the Defendants moved to dismiss the complaint for failure to state a claim, or in the

---

[11] In his Amended Complaint (ECF No. 33, Ex. 3), Beads pleads three causes of action: race discrimination in violation of Title VII against the MSP (Count One); race discrimination in violation of the equal protection clause of the Fourteenth Amendment against Sheridan in his individual capacity and Brown in his official capacity with respect to declaratory and injunctive relief (Count Two); and race discrimination in violation of Article 24 of the Maryland Declaration of Rights against the MSP and Sheridan (Count Three).  Am. Compl. at 39-49.

alternative, for summary judgment.  ECF No. 11.  On June 20, 2013, the Plaintiff moved for leave to file an amended complaint.  ECF No. 25.  On December 9, 2013, the Court issued a memorandum opinion and order granting the Plaintiff's motion for leave to file an amended complaint.  *See* ECF Nos. 31, 32.  The Court also granted the Defendants' motion to dismiss as to Count III against Sheridan, and denied the motion as moot as to all other counts.  *See id.*

On February 4, 2014, the Defendants moved for summary judgment.  ECF No. 39.  On March 4, 2014, the Plaintiff opposed the motion and moved to defer considering the motion for summary judgment.  ECF Nos. 44, 45.  On August 12, 2014, the Court granted the Plaintiff's Rule 56(d) request and denied the motion for summary judgment.  ECF Nos. 50-51.

On July 30, 2015, the Defendants moved for summary judgment.  ECF No. 70.  The Plaintiff's opposition was originally due on August 17, 2015.  On August 17, 2015, the Plaintiff filed a consent motion for a one-day extension of time to file his response because of a personal emergency.  ECF No. 73.  On August 19, 2015, the Plaintiff filed another consent motion for extension of time, giving him until August 20, 2015.  ECF No. 76.  On August 27, 2015, the Plaintiff moved for another extension of time to cover the delay from August 20 to August 27, 2015.  ECF No. 79.  The Court granted the motion.  ECF No.

14

81.  The Plaintiff, however, did not file his opposition until August 31, 2015.  The opposition was also captioned as a cross-motion for summary judgment.  ECF No. 82.  On September 17, 2015, the Defendants replied.  ECF No. 84.

The Defendants also moved to strike the Plaintiff's opposition.  ECF No. 83.  On September 17, 2015, the Plaintiff opposed the motion.  ECF No. 85.  On September 21, 2015, the Defendants replied.  ECF No. 86.

## II.  Analysis

### A.   The Defendants' Motion to Strike

The Defendants argue that the Court should strike the Plaintiff's opposition and cross-motion for summary judgement for two reasons.  First, the Plaintiff filed several days after the deadline.  ECF No. 83 at 1.  Second, the Plaintiff's filing purports to be a cross-motion for summary judgment, and was filed after the dispositive motion deadline had passed.  *Id*. The Plaintiff asserts that the delay was due to problems tracking down a witness for a declaration, and that counsel mistakenly believed that he was requesting an extension of time through August 31, 2015.  *See* ECF No. 85 at 5-8.  The Plaintiff also alleged that his cross-motion was filed in accordance with Local Rule 105(c).  *Id*. at 9.

15

Local Rule 105.2(a) requires, in pertinent part, that "all memoranda in opposition to a motion shall be filed within fourteen days of the service of the motion."  Federal Rule of Civil Procedure 6 governs the computation of time for filing an opposition.  Under Rule 6(b), a late filing may be excused "if the party failed to act because of excusable neglect."  The Rule, however, "does not specify the consequence to be administered if that deadline is not met."  *H & w Fresh Seafoods, Inc. v. Schulman*, 200 F.R.D. 248 252 (D. Md. 2000).  "In its discretion, therefore, the court may hear an untimely opposition."  *Id; see also Curtis v. Evans*, 2004 WL 1175227, at *1 (D. Md. May 27, 2004).

Local Rule 105(c) governs the filing of cross-motions for summary judgment.  The rule states that, "[i]n a two-party case, if both parties intend to file summary judgment motions, counsel are to agree among themselves which party is to file the initial motion.  After that motion has been filed, the other party shall file a cross-motion accompanied by a single memorandum (both opposing the first party's motion and in support of its cross-motion), the first party shall then file an opposition/reply, and the second party may then file a reply."

In this case, the Plaintiff sought three extensions of time to file his opposition, including one extension that excluded over a week of time after the fact.  Yet, the Plaintiff still

failed to file a timely opposition.  Despite these errors, the Plaintiff has at least provided a plausible explanation for the delay.  Because the Fourth Circuit has emphasized "the sound longstanding policy in favor of merits-based adjudication"[12] and there is no apparent prejudice to the Defendants, the Court will consider the Plaintiff's untimely opposition.

The Court, however, will not consider the Plaintiff's cross-motion for summary judgment.  The deadline for dispositive motions passed more than a month before the cross-motion was filed.  Although Local Rule 105(c) contemplates the filing of cross-motions as oppositions after the dispositive motion deadline, this is done when based on the discussion and agreement of the parties.  The Plaintiff never informed the Defendants that he wished to file a dispositive motion.  In fact, the Plaintiff has conceded that he never intended to file a motion for summary judgment until he was drafting the opposition.  ECF No. 85 at 9 n. 2.  Moreover, in seeking multiple extensions of time to file the opposition, the Plaintiff never informed the Defendants that the opposition would also be a cross-motion.  It is apparent that the Plaintiff is now attempting to use Local Rule 105(c) to screen his

---

[12] *Colleton Preparatory Acad., Inc. v. Hoover Universal. Inc.*, 616 F.3d 413, 417 n. 3 (4th Cir. 2010).

17

untimely conduct.  The Court will not consider the cross-motion.[13]

    B.    The Defendants' Motion for Summary Judgment

    1.    Legal Standards

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[14]  In considering the motion, the judge's function is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

---

[13] Even if the Court were to consider the cross-motion, it would have no effect on the outcome of the Court's analysis.  For the reasons stated *infra*, the Plaintiff has not proven his case when considering the evidence in the light most favorable to the Defendants. *See Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003) (When cross motions for summary judgment are filed, "each motion must be considered individually, and the facts relevant to each must be reviewed in the light most favorable to the nonmovant").

[14] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

The Court must "view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

2.   Methods of Proving Discrimination

A plaintiff can prove his employer's discrimination through one of two methods. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). First, a plaintiff may use "any direct or indirect evidence relevant to and sufficiently probative of the issue," under "ordinary principles of proof." *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (internal quotation marks omitted). To avoid summary judgment, the plaintiff must produce "direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (alteration in original) (internal quotation marks omitted).

Absent direct evidence of discrimination, the Court applies the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, the plaintiff must first establish a *prima facie* case of discrimination. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).  If he does, "a presumption of illegal discrimination" arises, and the burden of production shifts to the employer to articulate a nondiscriminatory reason for its adverse decision.  *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).

"If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981), and the *McDonnell Douglas* framework "drops out of the picture."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).  The plaintiff must then prove by a preponderance of the evidence that "the proffered reason was not the true reason for the employment decision," and that the true reason was discrimination.  *Burdine*, 450 U.S. at 256.  He may do this directly or indirectly, by "persuading the court that a discriminatory reason more likely motivated the employer" or by showing that the employer's explanation is "unworthy of credence."  *Id.*

3.   The Plaintiff's Federal Race Discrimination Claims[15]

"To establish a *prima facie* case of discrimination based on the enforcement of employee disciplinary measures, an employee must show that '(1) that he is a member of the class protected by Title VII, (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him [or her] were more severe than those enforced against those other employees.'" *Artis v. U.S. Foodservice, Inc.*, No. ELH-11-3406, 2014 WL 640848, at *8 (D. Md. Feb. 18, 2014) (quoting *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993)); *see also Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir.1985).

"With regard to the second and third elements of a *prima facie* case, a plaintiff can meet his or her burden by producing evidence of misconduct of other employees that is sufficiently similar to [his] own misconduct to permit a sound comparison between the discipline imposed in [his] case and in the prior

---

[15] The Plaintiff has alleged claims under Title VII and the Equal Protection Clause of the Fourteenth Amendment, cognizable under § 1983.  "Courts may apply the standards developed in Title VII litigation to similar litigation under § 1983." *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994); *see also Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989); *Mallory v. Booth Refrigeration Supply Co.*, 882 F.2d 908, 910 (4th Cir. 1989). Accordingly, the Court will analyze these claims together.

cases."  *Id.*; *see also Laing v. Fed. Exp. Corp.*, 703 F.3d 713,
719 (4th Cir.2013).  The plaintiff has the burden "to show that
he [is] similar in all relevant respects to his comparator."
*Haywood v. Locke*, 387 Fed. App'x 355, 359 (4th Cir. 2010).
"Comparison will never involve precisely the same set of work-
related offenses occurring over the same period of time and
under the same sets of circumstances;"[16] however, "the similarity
between comparators and the seriousness of their respective
offenses must be clearly established in order to be
meaningful."[17]  "Such a showing would include evidence that the
employees 'dealt with the same supervisor, [were] subject to the
same standards and . . . engaged in the same conduct without
such differentiating or mitigating circumstances that would
distinguish their conduct or the employer's treatment of them
for it.'"  *Haywood*, 387 Fed. App'x at 359 (quoting *Mitchell v.
Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992)); *see also Popo
v. Giant Foods LLC*, 675 F.Supp.2d 583, 589 (D. Md. 2009).

> a.   TFC Bigham

The Plaintiff's primary comparator is TFC Bigham.  The
Plaintiff argues that because TFC Bigham, "a white trooper who
was implicated in the same incident was not fully investigated,

---

[16] *Cook*, 988 F.2d at 511.

[17] *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th
Cir.2008).

administratively charged or disciplined in any way," there is evidence of discrimination. ECF No. 82 at 45. TFC Bigham, however, is problematic as the central comparator because he was only a TFC, while the Plaintiff was a corporal and a supervisor. *See Settle v. Balt. Cnty*, 34 F. Supp. 2d 969, 996 (D. Md. 1999).

Even if the Court were to find TFC Bigham a sufficient comparator to establish a *prima facie* case of discrimination, the Plaintiff has failed to rebut the Defendants' nondiscriminatory reason for the disparate treatment. The Defendants assert that TFC Bigham was not further investigated or charged because of a lack of evidence. ECF No. 70-2 at 21-25. Although the IAD investigator believed that Bigham supplied the test scenario to the Plaintiff, the only evidence he had was the telephone call between TFC Bigham and the Plaintiff, and an off-hand comment by Bigham to another Corporal about test questions. TFC Bigham *and the Plaintiff* denied TFC Bigham's involvement. As the Plaintiff argued to the Circuit Court, there was simply no evidence showing what happened during the phone call.

In comparison, IAD's investigation of the Plaintiff provided the Plaintiff's and TFC Simmons's statements that the Plaintiff provided the test question during a phone call, evidence of the Plaintiff's close relationship with Simmons, and a nearly identical hypothetical to a testing scenario which had

never been given on a past exam.  Even if IAD could not prove
the Plaintiff's source for the scenario, the lead investigator
determined that there was sufficient evidence to charge the
Plaintiff.

The gravamen of the Plaintiff's argument is that the
Defendants should have charged TFC Bigham.  In essence, the
Plaintiff is arguing that the Defendants did not make the *right*
decision.  However, in an employment discrimination case, this
Court does not "sit as a kind of super-personnel department
weighing the prudence of [the Defendants'] decisions."
*DeJarnette v. Corning, Inc.*, 133 F. 3d 293,299 (4th Cir. 1998)
(internal quotation marks omitted).  The purpose of this suit is
not to determine if the Defendants made the *correct* decision in
charging the Plaintiff and not TFC Bigham, rather, the purpose
is to determine if that decision was motivated by discriminatory
animus.[18]

---

[18] *See Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) ("Even
if these investigations were improper or substandard, that does
little to help her establish that the reasons given for her
termination were not the actual reasons, and it certainly does
not give rise to a reasonable inference that her race or gender
was the real reason for her termination."); *Countess v.
Maryland*, No. ELH-12-02252, 2014 U.S. Dist. LEXIS 5508, at *25
(D. Md. Jan. 16, 2014) ("[T]he employee's mere dissatisfaction
with the thoroughness or speed of the employer's investigation
does not give rise to liability under Title VII."); *Karpel*, 134
F.3d at 1227-29; *see also Hux v. City of Newport News*, 451 F.3d
311, 315 (4th Cir. 2006) ("Once an employer has provided a non-
discriminatory explanation for its decision, the plaintiff
cannot seek to expose that rationale as pretextual by focusing

"A plaintiff is entitled to a trial on the merits of a Title VII claim if [he] . . . establishes a factual record permitting a reasonable finder of fact to conclude that it is more likely than not that the adverse employment action was the product of discrimination . . . ." *Darvishian v. Green*, 404 F. App'x 822, 828 (4th Cir. 2010). The Plaintiff has not carried this burden. The Plaintiff relies solely on his belief that the Defendants' decision was based on intentional discrimination. *See Settle*, 34 F. Supp. 2d at 998-99 (plaintiff's firmly held belief that a disparate investigation was the result of discriminatory animus was not sufficient to support a federal discrimination claim). No reasonable jury could conclude that racial animus was a motivating factor in the Defendants' decisions about TFC Bigham.

            b.    The Other Comparators

None of the other comparators supplied by the Plaintiff establishes a prima facie case of discrimination because the circumstances for which these individuals were disciplined, and how they were disciplined differ greatly from the Plaintiff's case.

---

on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it.").

First, the comparators were disciplined by a different supervisor.  When a person is punished by a different decision-maker than a plaintiff, courts have routinely held that the individual is not a valid comparator.  *See Forrest v. Transit Mgmt. of Charlotte, Inc.*, 245 Fed. App'x 255, 257 (4th Cir. 2007) ("If different decision-makers are involved, employees are generally not similarly situated."); *Allen v. Dorchester Cnty.*, No. ELH-11-01936, 2013 WL 5442415, at *14 (D. Md. Sept. 30, 2013) ("Because the decision-makers who imposed plaintiff's discipline differed from those who imposed discipline on [other] employees prior to 2005, the [other] employees disciplined prior to 2005 are not "similarly situated" to plaintiff.").  Additionally, unlike the Plaintiff, a majority of the comparators were not supervisors at the time of their infractions.  *See Settle*, 34 F. Supp. 2d at 996.

Moreover, the offenses of all but one of the comparators are not sufficiently similar to the Plaintiff's to allow comparison.  *Lightner*, 545 F.3d at 265 ("The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful.").  Comparators A, B, D, and E were not charged with Category E integrity violations.  Moreover, these comparators admitted guilt and did not proceed to an administrative hearing.

In its findings, the Maryland Civil Rights Commission found
that none of these individuals was "similarly situated" to the
Plaintiff. *See* ECF No. 70-18 at 5-6.  Further, in a prior
opinion, this Court concluded that Comparator D's sexual
misconduct and Comparator E's use of a racial slur "are too
dissimilar to be considered of comparable seriousness to [the
Plaintiff's] alleged misconduct." ECF No. 31 at 11.

Perhaps recognizing that these comparators are too
dissimilar, the Plaintiff altered his argument somewhat to
assert that white troopers are charged with less serious
offenses. *See* ECF No. 82 at 30-33.  Thus, according to the
Plaintiff, Comparators A, B, D, and E were not charged with a
Category E offense because of their race.  The record, however,
contains no evidence supporting this argument.

First, even if the Court were to assume that the
comparators' underlying conduct was similar enough to permit
comparison, the Plaintiff ignores the central difference between
these comparators and his case, which is also the Defendants'
nondiscriminatory reason for the different charges.  These
comparators admitted the charges and did not proceed to an
administrative board.  Under the MSP's disciplinary procedure, a
charged trooper is allowed to contact the prosecutor at any time
to admit guilt and negotiate charges.  Admitting guilt is also a
mitigating factor for punishment.

27

The Plaintiff does not argue that he was barred from pursuing this course of action because of his race.  The Plaintiff chose to proceed to an administrative hearing on a Category E offense.  Further, the Court notes that the record shows that an African-American trooper was treated similarly to Comparator A during the same investigation.  The African-American trooper was permitted to admit his guilt to a lesser offense.  "If plaintiff's comparators are from the same protected class, then any discrepancy in discipline is not attributable to plaintiff's membership in that class."  *Allen v. Dorchester Cnty.*, No. ELH-11-01936, 2013 WL 5442415, at *15 (D. Md. Sept. 30, 2013); *see also Booth v. Maryland,* 327 F.3d 377, 383 (4th Cir. 2003).

The Plaintiff's "lesser charges" argument is also refuted by the case of Comparator C.  Comparator C, a white trooper, was charged with a Category E integrity violation for falsely reporting tickets.  This conduct is the most comparable to the Plaintiff's.  Comparator C did not admit his guilt and, despite his race, would have proceeded to an administrative board on the Category E offense.[19]

---

[19] Comparator C was not terminated for the Category E violation because the prosecutor failed to file the charges in a timely manner.  The Plaintiff argues that the Defendants have failed to show that their failure to timely file the charges was *not* due to discrimination.  *See* ECF No. 82 at 31-33.  This argument, however, attempts to turn the *McDonnel-Douglas* standard on its

c.    Statistics

In addition to the comparator information, the Plaintiff

attempts to establish a *prima facie* case using statistics.

First, the Plaintiff attempts to establish the

"discriminatory impact" of the Defendants' policies by

presenting retention statistics from his graduating class.

Retention rates do not necessarily implicate discrimination.

The Plaintiff does not take into account a trooper's choice to

retire, or move on to another police force, or myriad other

factors that would cause one to leave MSP.   The Plaintiff does

not argue that all of these individuals were terminated under a

disparate disciplinary procedure.   These statistics have no

---

head.   The Defendants have provided a nondiscriminatory reason
for the disparate outcome; thus, it is the Plaintiff's
responsibility to show that the nondiscriminatory reason is
pretext and was truly the result of discrimination.   Other than
the Plaintiff's conclusionary accusation that failing to file
charges was because of Comparator C's race, there is nothing on
the record supporting a discriminatory motive.   *See Settle v.
Balt. Cnty*, 34 F. Supp. 2d at 985 ("I am persuaded that
plaintiffs have seized on certain attributes of an admittedly
subjective decision-making and supervisory regime in a
paramilitary law enforcement organization to cobble together
grounds of complaint which, when all is said and done, fail at
every turn to project evidence of intentional racial
discrimination sufficient to permit a rational fact finder to
conclude by a preponderance of the evidence that they have been
victims of unlawful discriminatory and retaliatory acts . . . .
[W]hile it is certainly true that a court should examine
instances of alleged discriminatory treatment holistically and
not atomistically, this does not mean that evidence of a large
number of meritless claims (or non-cognizable allegations)
attains probative value when such claims are aggregated.")
(citation and quotation omitted.)

relevance to this case. *See Allen v. Prince George's Cnty.*, 737
F.2d 1299, 1303-04 (4th Cir. 1984) (It is a plaintiff's burden
to "demonstrate to the court's satisfaction that [his]
statistical comparisons are meaningful") (quoting *Trout v.
Lehman*, 702 F.2d 1094, 1104 (D.C. Cir. 1983)).[20]

The Plaintiff also misconstrues the statistical information
from the Defendants' disciplinary record.  In his opposition,
the Plaintiff argues that

> the MCCR identifying all troopers accused of Category
> E violations in the two years prior to Mr. Beads'
> termination confirms that, unlike their black
> counterparts, white troopers accused of Category
> E violations, including sustained allegations of
> cheating or making false reports, are frequently
> allowed to keep their jobs. *See* Ex. 9 at App. B.  The
> chart reveals that 16 of the 52 troopers accused of
> Category E violations during the two-year period were
> black. *Id.*  It also shows that, except for one case
> in which a black trooper was found not guilty by a
> hearing board, every black trooper accused of a
> Category E violation either resigned before
> adjudication, resigned in lieu of termination or was
> terminated. *Id.*  In other words, only one out of 16
> black troopers accused of a Category E violation kept
> his job. By contrast, nine out of 36 white troopers
> accused of Category E violations in the two- year
> period kept their jobs, including one trooper who was
> found not guilty by a hearing board, four troopers who
> were demoted and four troopers who had the charges
> against them withdrawn by the prosecutor.

---

[20] *See also Moultrie v. Martin*, 690 F.2d 1078, 1082, 1083 n. 7
(4th Cir. 1982) (directing that "[i]n all cases involving racial
discrimination, the courts of this circuit must apply a standard
deviation analysis such as that approved by the Supreme Court in
*Hazelwood* [*School District v. United States,* 433 U.S. 299, 309 n.
19 (1977)]," cautioning against the use of small sample sizes,
and noting that "[p]opulation sizes of less than 30 to 40 are
generally considered to be small samples . . . .").

ECF No. 82 at 28.  The Plaintiff asserts that these statistics show that MSP's supposed zero tolerance policy for integrity offenses is not administered uniformly.  *See id*.

The Plaintiff, however, fails to recognize that not every Category E offense is an integrity violation to which the zero tolerance policy applies.  The chart provided by the Defendants shows that, regardless of race, every individual charged with a Category E *integrity violation* was either terminated or resigned in lieu of termination.  *See* ECF No. 82-9, Appendix B.  At most, the Plaintiff is arguing that other infractions should be considered integrity violations.[21]  However, this Court does not "sit as a kind of super-personnel department weighing the prudence of [the Defendants'] decisions."  *DeJarnette*, 133 F. 3d at 299.  It is not the role of this Court to question MSP's definition of integrity violation, so long as there is no evidence that the policy is administered in a discriminatory matter.

As previously stated, "[a] plaintiff is entitled to a trial on the merits of a Title VII claim if [he] . . . establishes a factual record permitting a reasonable finder of fact to conclude that it is more likely than not that the adverse

---

[21] The Plaintiff made a similar argument in relation to Comparator D's and Comparator E's conduct.  *See* ECF No. 82 at 33-34.

31

employment action was the product of discrimination . . . ."
*Darvishian*, 404 F. App'x at 828.  Because no reasonable jury
could conclude that racial animus was a motivating factor in the
Defendants' decisions, the Court will grant summary judgment for
the Defendants on the federal discrimination claims.

      4.   The Plaintiff's State Law Claims

    Title 20 prohibits "employer[s]" from "fail[ing] or
refus[ing] to hire, discharg[ing], or otherwise discriminat[ing]
against any individual with respect to the individual's
compensation, terms, conditions, or privileges of employment
because of . . . the individual's race . . . ."  State Gov't §
20-606(a)(1)(i).  Maryland courts "traditionally seek guidance
from federal cases in interpreting [Title 20]." *Haas v.
Lockheed Martin Corp.*, 914 A.2d 735, 742 (Md. 2007); *see also
Bishop v. Bd. of Educ. of Calvert Cnty.*, 2011 WL 2651246, at *9
(D. Md. July 5, 2011) ("Maryland courts routinely look to Title
VII cases to determine the scope of liability under Title 20."),
*aff'd*, 466 F. App'x 261 (4th Cir. 2012).

    For the reasons the Plaintiff's federal claims will fail,
the Court will grant summary judgment on the Plaintiff's race
discrimination claims under Title 20. *See Barnes v. ISG
Sparrows Point, LLC*, No. BPG-10-2492, 2011 WL 4596058, at *6 (D.
Md. Sept. 30, 2011) (court's race discrimination analysis under
42 U.S.C. § 1981 applied equally to plaintiff's claims under

32

Title 20); *Bishop v. Bd. of Educ. of Calvert Cnty.*, No. DKC 11-1100, 2011 WL 2651246, at *9 (D. Md. July 5, 2011) ("Thus, Plaintiff's Title 20 claims fail for the same reasons as those brought pursuant to Title VII.").

III. Conclusion

For the reasons stated above, the Defendants' motion to strike will be granted in part; the Defendants' motion for summary judgment will be granted.

_____
Date

_____
William D. Quarles, Jr.
United States District Judge

33